# UNITED STATES DISTRICT COURT
for the
District of Massachusetts

**PHILIP GREENSPUN**

-v-

**PRO STAR AVIATION, LLC, AND AIRSPRINT, INC.**

Case No. 1:17-cv-10845

Jury Trial: **YES**

**COMPLAINT FOR, *INTER ALIA,* BREACH OF CONTRACT**

**I.     The Parties to This Complaint**

    **A.     The Plaintiff**

        Philip Greenspun
        10 Beaver Pond Road
        Lincoln, MA 01773
        pgreenspun@gmail.com
        (617) 864-6832

    **B.     The Defendants**

        Pro Star Aviation, LLC
        Attn: Kevin Harriman, Managing Partner
        5 Industrial Drive,
        Londonderry, NH 03053
        kevin@prostaraviation.com
        (603) 627-7827

        -AND-

        AirSprint, Inc.
        Attn: James Elian, President and Chief Operating Officer
        1910 McCall Landing NE
        Calgary, AB T2E 9B5
        Canada
        jae@airsprint.com
        (403) 730-2344

II. **Basis for Jurisdiction and Venue**

Whereas:

1. Plaintiff Philip Greenspun is an individual citizen of the Commonwealth of Massachusetts, United States of America,
2. Defendant Pro Star Aviation, LLC (hereinafter "Pro Star") is a Domestic Limited Liability Company incorporated under the laws of the State of New Hampshire and has its principal place of business in the State of New Hampshire, and
3. Defendant AirSprint, Inc. (hereinafter "AirSprint") is a Corporation registered under the laws the Province of Alberta, in the country of Canada having its principal place of business in the Province of Alberta,

the parties are diverse in citizenship, and the amount at stake is more than $75,000, the United States District Court has jurisdiction pursuant to 28 U.S.C. § 1332.

Venue is proper under 28 U.S.C. § 1391(b)(2) because the subject Aircraft is based in Massachusetts.

Venue is proper:

1. under 28 U.S.C. § 1391(c)(1) because Plaintiff resides in Lincoln, Massachusetts,
2. under 28 U.S.C. § 1391(c)(2) because Defendant Pro Star Aviation is subject to personal jurisdiction in Massachusetts, and
3. under 28 U.S.C. § 1391(c)(3) because Defendant AirSprint, Inc. is not a resident of the United States.

III. **Jury Trial Demanded**

Pursuant to Rule 38, a Jury Trial is Demanded.

IV. **Summary of Case**

Plaintiff contracted to purchase, and subsequently purchased, in May 2014, a $1.65 million airplane from Defendant AirSprint. Defendant Pro Star was contracted to perform a pre-buy inspection to determine, *inter alia*, whether or not the airplane complied with AirSprint's representations and to certify the airplane as airworthy with an FAA annual inspection. Pro Star was also contracted to perform two additional FAA-required annual inspections of the airplane. Pro Star was paid more than $100,000 for these inspections. Atlas Aircraft took over maintenance for the airplane in late 2016. As a result of the inspection done by Atlas, Plaintiff discovered that AirSprint did not deliver the airplane in the condition represented in the purchase contract, Pro Star did not find serious discrepancies during its pre-buy inspection, and that consequently (1) the aircraft had been unairworthy per FAA regulations, (2) the aircraft required expensive corrective maintenance, and (3) the aircraft's value was impaired.

Hence AirSprint fraudulently induced Plaintiff to enter into a contract, breached its contract and was negligent. Pro Star also breached its contracts and was negligent in connection with its pre-buy services and with subsequent FAA-required inspections.

V.  **Statement of Claims**

**Factual Allegations**

1. AirSprint delivered Aircraft Documents containing a logbook entry dated 8/5/2010, stating substantially "CORROSION REMOVED. NDT CARRIED OUT ON AREA REFERENCE RTD QUALITY SERVICES JOB #105,0092 REPORT #11. PATCH INSTALLED REFERENCE AERO AVIATION INC WO."

2. On or around April 8, 2014, Plaintiff (and a partner) entered into an Aircraft Purchase Agreement ("Purchase Contract") to govern the purchase of a turboprop aircraft, a 2000 Pilatus model PC-12/45 airplane, manufacturer's serial number 0353, ("Aircraft") from Defendant AirSprint. The purchase price was set at $1.675 million.

3. Defendant Pro Star was hired to conduct a pre-buy inspection of the Aircraft. A wire transfer of $8,000 was sent to Pro Star on April 10, 2014.

4. Defendant Pro Star identified a dent on the Aircraft that proved to be 69/1000th of an inch deep. It had been concealed with plastic filler ("Bondo") and paint.

5. Defendant Pro Star consulted with the engineering department at Pilatus, the airplane's manufacturer, and received an approved procedure to repair the dent by pushing it back out.

6. Plaintiff received an estimate from an industry expert, J.P. Hanley, that the dent, despite the manufacturer-approved repair, should result in a deduction to the purchase price of 5-7 percent (i.e., between $83,750 and $117,250). Plaintiff forwarded this estimate to Defendant AirSprint.

7. Defendant AirSprint responded via email from James Elian on May 14, 2014 offering an adjusted purchase price of $1.665 million, explaining that "I feel that a 11.5% ($86,783) difference from VRef removes the risk of the dent resale value."

8. After a May 14, 2014 telephone negotiation between Plaintiff and Mr. Elian, in which Mr. Elian emphasized that the market value of PC-12 airplanes had gone up between April 8, 2014 and May 14, 2014, an agreement was reached to purchase the aircraft for $1.655 million.

9. The purchase was completed with a closing date of May 15, 2014.

10. AirSprint expressly warranted that the Aircraft was "equipped as specified in the Aircraft Specification and in the same condition as at the completion of the Inspection, normal wear and tear excepted." The Aircraft was represented as complying with at least descriptions 3.1.1, 3.1.4, 3.1.5, 3.1.6, 3.1.7, 3.1.8, 3.1.9, and 3.1.10 in the Purchase Contract.

11. AirSprint further expressly warranted that the Aircraft had current and valid Canadian airworthiness certificate and all the documentation required for the issuance of a US FAA airworthiness certificate.

12. AirSprint expressly warranted the Aircraft was in proper condition to be legally airworthy for both private and commercial operation in the US. AirSprint expressly warranted that the Aircraft would be delivered "with no corrosion beyond the manufacturer's tolerances or limits."

13. AirSprint expressly warranted the Aircraft complied with the manufacturer's required maintenance programs, and the like.

14. AirSprint expressly warranted there were no temporary, loan or exchange parts in the Aircraft. AirSprint expressed warranted that the Aircraft would be delivered "with an executive interior with seven leather seats."

15. AirSprint delivered only a portion of the Aircraft, at least in as much as it delivered the Aircraft without any of its original seats.

16. AirSprint expressly warranted that it would provide complete Aircraft Documents in compliance with the Federal Aviation Regulations.

17. AirSprint agreed the sale was contingent on a pre-purchase inspection "sufficiently extensive" to ensure proper importation and FAA annual inspection subject to approval by AirSprint.

18. Defendant Pro Star represented that it completed a pre-purchase and annual inspection on 5/16/2014 at a cost of $20,044.21. This inspection included a line item for "logbook research." Plaintiff believes that the passenger seats were removed and reinstalled by Pro Star during this inspection, and subsequent inspections.

19. Defendant Pro Star represented that it completed a second annual inspection on 4/28/2015 at a cost of $49,516.53. This inspection included a line item for "logbook research."

20. Defendant Pro Star represented that it completed a third annual inspection on 2/3/2016 at a cost of $33,551.50. This inspection included a line item for "logbook research."

21. In mid-January 2017, Atlas Aircraft Center completed an annual inspection (hereinafter "Atlas Inspection") at a cost of $84,522.92 including repair and documentation of substantial discrepancies not previously disclosed by AirSprint or previously discovered by Pro Star. Correction of these discrepancies was required to restore the Aircraft to airworthy status.

22. The Atlas Inspection revealed that AirSprint delivered the Aircraft with seats other than the ones originally supplied by Pilatus. One of these seats was, due to being placarded for forward-facing use and being installed in an aft-facing position, unairworthy. Due to a difference in leg design and configuration, a forward-facing seat cannot be used in an aft-facing position without compromising passenger safety in the event of an accident. Thus, the Aircraft

cannot be airworthy without seats placarded and designed for use in their corresponding positions.

23. The Atlas Inspection revealed that AirSprint misrepresented the airworthiness of the Aircraft, and misrepresented that the procedures AirSprint claimed to have used to maintain the Aircraft complied with the manufacturer's required procedures, both of which were expressly warrantied by AirSprint.

24. The Atlas Inspection revealed AirSprint delivered the Aircraft with seatbelts that had been re-webbed rather than "overhauled" as required every 12 years.

25. The Atlas Inspection revealed that AirSprint cut holes in the pressure vessel of the Aircraft in 2010, apparently to address corrosion, and patched over these holes without consulting with Pilatus, the Aircraft manufacturer, whose engineering department must conduct an analysis of any substantial repair. The logbook created by AirSprint contains an entry stating "corrosion removed," which is misleading as holes were actually cut in the pressure vessel (i.e., a portion of the airplane's structure was removed) rather than, as required by Pilatus service manuals, treating the corrosion as per industry standard practice.

26. Plaintiff brought the issues uncovered by the Atlas Inspection to the attention of AirSprint in late 2016 / early 2017, but AirSprint refused to assist in addressing the problems.

27. Plaintiff brought the issues uncovered by the Atlas Inspection to the attention of Pro Star in late 2016, but Pro Star refused to offer any assistance in addressing the problems.

28. Via his attorney, Plaintiff sent a demand letter complying with the requirements of Massachusetts General Law Chapter 93A, to Pro Star on April 12, 2017.

29. Via his attorney, Plaintiff sent a demand letter complying with the requirements of Massachusetts General Law Chapter 93A, to AirSprint on April 12, 2017.

30. Pro Star replied to Plaintiff's letter of (19) on April 28, 2017 denying liability and offering the following opinions: (A) the corrosion repair was proper, (B) the seatbelts were not due for overhaul until 2023, (C) that a maintenance facility would not verify that the correct seats were installed in an Aircraft during an annual inspection, and (D) Pro Star was not contracted to perform "a detailed log book review," verify that the proper components were installed in the aircraft, or, indeed, do anything beyond a standard annual inspection. (Pro Star's 4/7/2014 invoice is for a "Pro Former [*sic*] invoice for annual/pre-buy on SN 353".) Pro Star's response did not include a reasonable offer of settlement.

31. AirSprint responded to Plaintiff's demand letter on May 10, 2017, denying all liability. AirSprint at no time made any reasonable offer of settlement.

**COUNT 1**
*Breach of Contract by AirSprint*

5

32. Plaintiff repeats and realleges each of the Factual Allegations as if fully set forth herein.

33. AirSprint breached the Purchase Contract by not delivering a complete Aircraft as defined by Purchase Contract Article I ("Aircraft").

34. AirSprint breached the Purchase Contract 3.1.1 by not delivering an aircraft that was "equipped as specified in the Aircraft Specification."

35. AirSprint breached the Purchase Contract 3.1.4 by not delivering an aircraft that was "in an airworthy condition suitable for operations under Part 91 and Part 135 of the FAR."

36. AirSprint breached the Purchase Contract 3.1.5 by not delivering an aircraft that was "compliance with all applicable FAA airworthiness directives and mandatory service bulletins (or manufacturer's equivalent)."

37. AirSprint breached the Purchase Contract 3.1.6 by delivering an aircraft having "temporary, loan or exchange," at least with regard to one or more of the seats.

38. AirSprint breached the Purchase Contract 3.1.7 by delivering an aircraft not having proper Aircraft Documents.

39. AirSprint breached the Purchase Contract 3.1.8 at least by not disclosing known corrosion damage.

40. AirSprint breached the Purchase Contract 3.1.9 by delivering an Aircraft with corrosion beyond the manufacturer's tolerances or limits.

41. AirSprint breached the Purchase Contract 3.1.10 without an executive interior with seven leather seats refurbished in 2011.

42. AirSprint breached the Purchase Contract 4.3.1-3 in as much as AirSprint was in breach of at least 3.1.1, 3.1.4, 3.1.5, 3.1.6, 3.1.7, 3.1.8, 3.1.9, and 3.1.10. Knowledge of these problems would have given Plaintiff the option to reject the aircraft.

## COUNT 2
*Negligence by AirSprint*

43. Plaintiff repeats and realleges each of the Factual Allegations as if fully set forth herein.

44. AirSprint had a duty to properly maintain and document the Aircraft such that the Aircraft was airworthy both *de jure* pursuant to numerous regulations, and *de facto* at least in as much as an improperly installed seat, and improper repairs to the pressure hull of a pressurized Aircraft were dangerous.

45. AirSprint delivered the Aircraft to Plaintiff in an unairworthy condition, breaching the foregoing duty.

46. AirSprint's breach caused economic harm to Plaintiff, and it was entirely

foreseeable that any party buying the Aircraft from AirSprint would be so harmed.

## COUNT 3
*Fraud by AirSprint*

47. Plaintiff repeats and realleges each of the Factual Allegations as if fully set forth herein.

48. AirSprint made numerous affirmative representations, at least some of which were in the Purchase Contract, and at least others of which were contained in the Aircraft Documents. AirSprint delivered the Aircraft with Aircraft Documents with false or misleading logbook entry of 8/5/2010 stating "CORRIOSION REMOVED" when in fact unapproved holes were cut into the Aircraft.

49. This false entry was made intentionally and recklessly without regard to falsity, safety or regulatory compliance well knowing that any passengers or future buyer would be harmed by the false entry.

50. At the time of entering into the Purchase Contract, AirSprint intentionally and recklessly represented the truth of the Aircraft Documents to induce Plaintiff to enter into the Purchase Contract.

51. At the time of entering into the Purchase Contract, AirSprint intentionally and recklessly failed to disclose the unapproved holes in the aircraft.

52. Plaintiff reasonably and justifiably relied on AirSprint's representations (at least including 3.1.1, 3.1.4, 3.1.5, 3.1.6, 3.1.7, 3.1.8, 3.1.9, and 3.1.10 in the Purchase Contract) as being true in deciding whether to enter into the Purchase Contract and consummate a purchase of the Aircraft.

53. Plaintiff was harmed by AirSprint's misrepresentations.

## COUNT 4
*Violation of Mass. Gen. L. c. 93A by AirSprint*

54. Plaintiff repeats and realleges each of the Factual Allegations as if fully set forth herein.

55. AirSprint misrepresented the aircraft, in at least the ways alleged in, at least including 3.1.1, 3.1.4, 3.1.5, 3.1.6, 3.1.7, 3.1.8, 3.1.9, and 3.1.10 in the Purchase Contract, above. This misrepresentation was an unfair and deceptive trade practice.

56. AirSprint misrepresented the logbooks of the aircraft, which were inconsistent and/or misleading such as with respect to the holes cut in the pressure vessel.

57. Plaintiff has been harmed by AirSprint's unfair or deceptive acts and practices,

including, but not limited to, the two foregoing misrepresentations.

58. The conduct and actions of AirSprint were knowing and willful.

59. Plaintiff has duly made demand upon AirSprint as required under Mass. Gen. L. c. 93A.

60. AirSprint has not made any reasonable offer of settlement.

## COUNT 5
*Breach of Contract by Pro Star*

61. Plaintiff repeats and realleges each of the Factual Allegations as if fully set forth herein.

62. Although it accepted $8,000 on or around 4/10/2014 specifically to perform proper pre-purchase services, Defendant Pro Star failed to detect discrepancies in both the Aircraft and in the Aircraft Document. Plaintiff relied on Pro Star's representations that the Aircraft was airworthy and in a fit condition for importation. The reliance led Plaintiff to complete a purchase of an unairworthy aircraft. The Aircraft's value was impaired by these discrepancies, and as a consequence, Plaintiff suffered damages. Pro Star was unjustly enriched by accepting payment but not performing its duties.

63. Although it accepted an additional $13,044.21, which was invoiced on or around 5/16/2014, to complete a proper annual inspection and related maintenance in accord with all FAA regulations and customary industry practices, Defendant Pro Star breached its obligations by failing to perform a proper inspection at least in as much as it did not correct discrepancies such as improper seats, improper repairs to seat belts, and an improper repair to the pressure vessel of the Aircraft. Therefore, Pro Star was further unjustly enriched.

64. Defendant Pro Star invoiced a second annual inspection on 4/28/2015 at a cost of $49,516.53 where it again failed to determine or correct at least the material discrepancies previously identified. Therefore, Pro Star was further unjustly enriched.

65. Defendant Pro Star invoiced a third annual inspection on 2/3/2016 at a cost of $33,551.50. Therefore, Pro Star was further unjustly enriched.

## COUNT 6
*Negligence by Pro Star*

66. Plaintiff repeats and realleges each of the Factual Allegations as if fully set forth herein.

67. When it accepted $8,000 on or around 4/7/2014 to provide a pre-purchase inspection, Pro Star accepted the customary duty of identifying all material discrepancies in the Aircraft.

68. Pro Star breached its duty as evidenced by at least the fact that the first time

    another maintenance facility (Atlas) inspected the Aircraft, that other maintenance facility determined that the Aircraft was unairworthy. This duty is based both on regulatory requirements and obligations of FAA certified inspectors (which could never be waived by contractual agreement), and independently on the contract between Plaintiff and Pro Star.

69. Consequently, Plaintiff purchased an Aircraft whose value was impaired (never mind the risk of flying an unairworthy, improperly repaired Aircraft), and was thus harmed.

70. The errors and omissions of Pro Star were the cause harm suffered by Plaintiff.

71. Pro Star assumed a duty to execute proper maintenance, inspection procedures, and to document those procedures such that the Aircraft was airworthy both de jure pursuant to numerous regulations, and de facto at least in as much as an improperly installed seat, and improper repairs to the pressure hull of a pressurized Aircraft were dangerous.

72. Pro Star delivered the Aircraft to Plaintiff in an unairworthy condition, subsequent to three annual inspections (5/16/2014, 4/28/2015, and 2/3/2016) which, for the same reasons, breaching the foregoing duty.

73. Pro Star's foregoging breach caused economic harm to Plaintiff, and it was entirely foreseeable.

## COUNT 7
*Violation of Mass. Gen. L. c. 93A by Pro Star*

74. Plaintiff repeats and realleges each of the Factual Allegations as if fully set forth herein.

75. Defendant Pro Star held itself out to solicit business in Massachusetts, and represented itself as competent to perform complex maintenance on Pilatus Aircraft.

76. At least in as much as Pro Star was not able to perform a pre-purchase inspection to industry standards, Pro Star its representations were deceptive.

77. At least in as much as Pro Star accepted $8,000 to perform a pre-purchase inspection to industry standards, and which failed of its essential purpose, its representations of competence to perform the pre-purchase inspection were unfair.

78. It was unfair for Pro Star to accept $13,044.21 on or around 5/16/2014 for an annual inspection which did not render the Aircraft airworthy.

79. It was unfair for Pro Star to accept $49,516.53 on or around 4/28/2015 for an annual inspection which did not render the Aircraft airworthy.

80. It was unfair for Pro Star to accept $33,551.50 on or around 2/3/2016 for an annual inspection which did not render the Aircraft airworthy.

81. Plaintiff has been harmed by Pro Star's unfair or deceptive acts and practices, including, but not limited to, the foregoing allegations in this Count 6.

82. The conduct and actions of Pro Star were knowing and willful.

83. Plaintiff has duly made demand upon Pro Star as required under Mass. Gen. L. c. 93A.

84. Pro Star has not made any reasonable offer of settlement.

## VI. Relief Demanded

85. On information and belief, Plaintiff estimates that, despite the engineering analysis by Pilatus and subsequent repairs to the pressure vessel by Atlas in accordance with that analysis, the holes cut in the pressure vessel, not disclosed by AirSprint and not discovered by Pro Star, have further diminished the Aircraft's value by 5-10 percent. Moreover, the Aircraft Documents were not properly maintained at least with respect to this repair and the non-original seat installed in Aircraft. A substantially damaged-and-repaired Aircraft is not worth as much as a damage-free Aircraft. For the purposes of this Complaint, while reserving the right to conduct further research, Plaintiff asserts he was damaged by at least $82,750 (5 percent of the $1,655,000 purchase price) plus $14,161 paid to Atlas for repairs, and demands reimbursement of $96,911 from AirSprint.

86. Plaintiff paid $9,574 to correct the unairworthy seatbelts, and demands reimbursement from AirSprint.

87. On information and belief, Plaintiff determined that a replacement seat costs $24,080, and demands payment for at least one seat. However, a full and complete correction of AirSprint's breach of 3.1.6 ("with no parts, systems or components installed in the Aircraft on a temporary, loan or exchange basis") and 3.1.10, and Pro Star's failure to discover the discrepancies in seat serial numbers and placards, would require a require a set of 7 new seats. Plaintiff reserves the right to conduct further research, for example such as the effect of incorrect log entries with respect to the installation of the incorrect and non-original seat, on the diminution to Aircraft value as a result of its being separated from its original interior and as a result of the logbook discrepancies. Plaintiff presently demands $24,080 from AirSprint, the cost of a single seat.

88. Plaintiff demands reimbursement from ProStar of the $8,000 by which ProStar was unjustly enriched by failing to perform a proper pre-purchase inspection.

89. Plaintiff demands reimbursement from ProStar of the $13,044.21 by which ProStar was unjustly enriched by failing to perform a proper annual inspection on or around 5/16/2014.

90. Plaintiff demands reimbursement from ProStar of the $49,516.53 by which ProStar was unjustly enriched by failing to perform a proper annual inspection on or around 4/28/2015.

91. Plaintiff demands reimbursement from ProStar of the $33,551.50 by which ProStar was unjustly enriched by failing to perform a proper annual inspection on or around 2/3/2016.

92. WHEREFORE, Plaintiff requests that this Court order Defendants to pay damages of approximately $234,677.24, pre- and post-judgment interest, treble damages, and Plaintiff's costs and attorney's fees.

**93. Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

| | |
|---:|:---|
| Date of signing: | 5/11/2017 |
| Signature of Attorney: | /S/ Richard Ben Amster |
| Printed Name of Attorney: | Richard Ben Amster |
| Bar Number: | 679,323 |
| Name of Law Firm: | N/A |
| Street Address: | 158 Naples Road Brookline |
| State and Zip Code: | MA 02446 |
| Telephone Number: | (617) 734-3200 office (617) 388-6875 mobile |
| E-mail Address: | richard.amster@gmail.com |

\